Williams v. The State.

JOHN WILLIAMS, PLAINTIFF IN ERROR, v. THE STATE OF NEBRASKA, DEFENDANT IN ERROR.

1. **Practice.** CONTINUANCE. On motion for a continuance it is not good practice to permit counter affidavits as to what an absent witness would testify.

2. ———: ———: AFFIDAVIT. An affidavit of the prisoner to the effect that he had been *informed* that a person absent from the state would swear to certain material facts is not sufficient to warrant a continuance. If the information came from the proposed witness, it should be so stated, but, if from a third party who knows he would so testify, then the affidavit of that person should be procured.

3. **Criminal Law:** IMPLIED MALICE. On a trial for murder, where the prosecution establishes against the prisoner an intentional homicide, and nothing explanatory is shown, the implication of malice at once arises, which it is incumbent upon the prisoner to remove.

Williams v. The State.

4. ———: CHARGE TO THE JURY. Instructions given to a jury should be applicable to the case as made by the testimony, and if they are not, and have a tendency to mislead, the judgment will be reversed.

5. ———: VERDICT. The jury returned a written verdict in these words: "We the jury in this case, being duly impaneled and sworn, do find and say that ———— is guilty of manslaughter." This was held to be void, for wholly· omitting in any manner to designate the defendant as the guilty party.

6. ———: ———: Under an indictment charging murder in the *first* degree where the jury finds the defendant guilty of manslaughter merely, the failure to specifically negative the fact that the crime was of a higher grade than that found is no ground for a reversal of the judgment.

ERROR from the district court of Buffalo county. The plaintiff in error ·was indicted for murder at the March term, 1876, of the district court for Kearney county. The cause was taken on change of venue . to Buffalo county, where the prisoner was tried at the March term, 1876, of that county, found guilty of manslaughter, and sentenced to imprisonment in the penitentiary for the term of ten years. On the trial of the cause before GASLIN, J., the following, among other instructions, were given to the jury:

3. "Should you find from the evidence in the case that the accused did the shooting as charged, you have a right to presume from this that he intended to do it, and that malice was implied therefrom, as it is a legal presumption that the defendant intended. to do what he actually did. In law a gun loaded with powder and ball or shot and used in its ordinary legitimate way, is a deadly weapon, and should you find from the evidence that the prisoner committed the crime as alleged with the gun, it is a legal presumption that he did it with malice; and if you so find it is then incumbent upon the accused, by way of justification, or excuse, or otherwise, to remove this legal presumption."

7. " Should the evidence in this case satisfy you that the killing was unlawfully done by the defendant, but without malice either intentional or unintentional upon a sudden quarrel, when the mind of the prisoner had been wrought up to that pitch by rage or passion that reason was wholly or partially dethroned, or it was unintentionally done while the accused was in the commission of some unlawful act you will be warranted in finding him guilty of manslaughter."

9. " If you find the accused was in imminent or apparent danger of receiving great bodily harm from the deceased at the time of the homicide, or that the deceased was about to commit a felonious assault upon the defendant, was in the situation, had the implements and weapons, and possessed the animus, ability, and was in a position to do so at the time of the killing, or that the deceased was about to take the life of the prisoner, and there was no other way for him to save it than to commit the homicide; or that he had a just and well grounded apprehension that deceased was about to kill him or to do him great bodily harm, and that there was no other way to save himself from the impending danger of life, limb, or great bodily injury than to commit the homicide, you would be warranted therefrom in acquitting the accused, if you are satisfied that he was fully excused or justified under the circumstances in taking the life of the deceased."

*James Laird and F. G. Hamer*, for the plaintiff in error.

*George H. Roberts*, Attorney General, for the State.

Lake, Ch. J.

In this case no less than twenty-six errors are formally assigned, many of which, however, are but repetitions,

in slightly different language of a single complaint to the ruling of the court. Therefore we shall notice only those objections which seemed to be relied on in argument, or which possess at least the shadow of merit.

I. Taken in the order of occurrence, the first objection to be noticed was taken to the overruling of the defendant's motion for a continuance of the case on account of the absence from the state of one George Hicks, who it was claimed was then in Iowa, and who, if present, would testify to certain facts material to the defense. This motion was supported by the affidavit of the prisoner, in which he swore substantially that Hicks would testify that on the night before the alleged homicide he staid at the house of David Vroman, the father of the deceased, and that both the deceased and his father "threatened to kill the defendant, and were actually making arrangements to attack him that night. That, to prevent the same, witness remained there all night, and slept in front of the door to prevent them going out. That during the evening the said deceased, Thomas R. Vroman, was absent from the house, and, as witness believes, had taken away the horse of affiant and stated that they would watch for affiant in the morning. That both of deceased said, on the morning of the day of the alleged homicide, that if defendant attempted to get his horse that they would certainly kill him, and made unqualified threats to kill this affiant."

On motion of the district attorney the court permitted the counter affidavit of the mother of the deceased to be interposed, in which she swore that she was present at the time stated, and that no such threats against the defendant were made. Thereupon the motion to continue was overruled.

As a matter of practice we see no propriety in permitting the use of counter-affidavits on a motion for a

continuance.   We do not think a side issue of this sort should be raised, or the truthfulness of the affidavit in support of the motion be determined in this unsatisfactory manner.   And if the affidavit in support of the motion in this case were such as to show that the ends of justice required a continuance of the case to enable the accused to obtain material testimony known to exist, we should feel bound to reverse the judgment on this ground alone, regardless of the affidavit of Mrs. Vroman, even if no other error were committed.   But in our opinion the affidavit of the prisoner was not sufficient to warrant a continuance.   It is exceedingly meagre, and altogether too indefinite in respect to the source of the affiant's information that Hicks would testify as claimed.   The prisoner states that he obtained the information the day before he made the affidavit, but from whom it came, or whether it was probably reliable, does not appear.   If the information came from Hicks himself he should have so stated in the affidavit, but if from some one else who knew he would so testify, then the affidavit of that person ought to have been procured.   Throwing the counter affidavits therefore entirely out of view as being improperly in the case, and considering only that of the defendant, we see no error in refusing a continuance of the case.

II. The record shows that the defendant excepted to each of the several instructions given by the court to the jury upon its own motion, and also to those given on behalf of the prosecution.   It was not claimed in argument, however, that these exceptions were *all* well taken, it being conceded that many of the instructions laid down the law of the case correctly; therefore we shall notice those only wherein it seems to be thought that error prejudicial to the prisoner was committed.

Considerable fault was found with the *third* instruction, wherein the court charged as to the presumption of

malice arising from the deliberate use of a deadly weapon upon the person of another. This instruction was in substance, that if the jury found "from the evidence in the case that the accused did the shooting as charged," they had a right to presume from this that he did it maliciously. And further, that if they so found, it was "then incumbent on the accused by way of justification, or excuse, or otherwise, to remove this legal presumption."

As the case stood before the jury under the testimony this was a correct statement of the law applicable thereto. The prosecution, in making out its case, had merely produced certain facts which showed very conclusively that the deceased was shot to death by the prisoner, but none of the circumstances immediately attendant upon the transaction were brought to light until the testimony for the defense was introduced. But the theory of the defense was not a denial of the fact that the prisoner shot the deceased, for this was admitted; it was a complete justification on the ground of absolute necessity in the protection of his own person from death or great bodily harm at the hands of the deceased and his father, by whom he was violently assaulted. The prosecution having established the fact of intentional homicide, the implication of malice at once arose, and it devolved upon the defendant to remove this presumption by satisfying the jury that it was not felonious, but that it was committed, as claimed, in the necessary defense of his own person from an impending death, or great bodily harm. *Com. v. York,* 9 Met., 93. *Com. v. Webster,* 5 Cush. *Preuit v. The People,* 5 Neb., 377. As to the right of the defendant thus to have defended himself against such threatened personal violence the jury were fully and fairly advised by the ninth instruction, which stated the law applicable to this branch of the case correctly.

But as to the seventh instruction the court was less fortunate. By this the jury were told, among other things, that if the killing "was intentionally done while the accused was in the commission of some unlawful act," they "would be warranted in finding him guilty of manslaughter." This was clearly erroneous. There was no claim made nor was there any testimony to show that the prisoner was engaged at the time in the commission of any unlawful act which resulted in the unintentional killing of the deceased. It was the theory of the prosecution that the homicide was intentional, malicious, and premeditated; that of the defense that it was intentional, but in necessary self-defense; and the testimony on both sides was calculated to support these respective claims. The legitimate effect of this instruction was to give the jury to understand that they would be warranted in finding the prisoner guilty of manslaughter, because of an unintentional killing resulting from the commission of some other unlawful act in which he was engaged. This was calculated to mislead the jury, and is good ground for a reversal of the judgment. *Curry v. The State*, 4 Neb., 545. With this exception we perceive nothing in the instructions of which the defendant can justly complain.

III. It is also assigned for error that the evidence was insufficient to justify a conviction, but as this point was not urged upon the argument, and a careful reading of the testimony fully satisfying us that there was no error in this respect, we will dismiss it without further comment.

IV. Another objection is that no valid verdict was returned—in other words, that it was a mere nullity and not sufficient to support a judgment. It was in these words :

" We, the jury in this case, being duly impaneled and sworn, do find and say that —— —— is guilty of manslaughter.

(Signed)                    " H. H. ACHEY, *Foreman*."

It was conceded by the attorney general that the omission to designate the prisoner in some manner as the person found to be guilty, was a fatal defect. That it is so there can be no doubt whatever. We may have an abiding conviction that the prisoner was the one upon whom they intended to fix the guilt—that it could have been no one else—but this is not enough. The verdict of the jury is a step in the conviction of an individual for a felony that cannot be left to conjecture, but it must speak for itself as to every material fact, sensibly, without ambiguity, and with certainty, or it should be set aside. We regard this as a void verdict, and of no legal force or effect whatever. This, too, is an error that calls for a reversal of the judgment.

V. Another objection to this verdict deserving of notice is the omission of the jury to declare specifically their finding as to the prisoner's guilt of the two higher grades of homicides, viz: murder in the *first* and *second* degrees, for either of which a conviction might have been had under the indictment.

Section four hundred and eighty-seven of the criminal code provides that : " Upon an indictment for an offense consisting of different degrees, the jury may find the defendant not guilty of the degree charged, and guilty of any degree inferior thereto," &c. This section is undoubtedly applicable to the case now under consideration, and its language would seem to imply that the legislature contemplated at least a specific finding as to the highest degree of criminality charged in the indictment.

While it might be profitable to the prosecution to require this course to be pursued in practice, it is a fact with-

in our knowledge that it is seldom done. Nor do we see how the failure of the jury to observe this formality could possibly work the least prejudice to the defendant. When the jury on trial for murder in the first degree return a verdict of " guilty of manslaughter," the presumption is that they have done their whole duty under their oaths, and that they failed to find, from the evidence, some fact necessary to constitute a higher grade of crime. In considering this question it is well to bear in mind that the section from which we have just quoted does not declare what the verdict shall contain; it simply authorizes the jury to find an inferior offense whose elements are all included in a higher crime which the indictment charges, but which they find the proofs do not sustain.

But section four hundred and eighty-nine, which also has a direct bearing upon this question, declares: " That in all trials for murder, the jury before whom such trial is had, if they find the prisoner guilty thereof, shall ascertain in their verdict whether it be murder in the first or second degree, or manslaughter," etc.

In Ohio, from whence our code was principally borrowed, it is held that in all cases of homicide where the charge is of a higher degree than manslaughter, it is absolutely essential to the validity of the verdict that it formally express the degree of crime found. *Dick v. The State*, 3 Ohio State, 89, and *Parks v. The State*, Id., 101. It is true that these decisions were made by a divided court, and that they are in direct conflict with those of Pennsylvania, where this particular provision seems to have originated. *White v. The Commonwealth*, 6 Binn., 182. Nevertheless we feel bound to follow the Ohio cases, not alone from the fact that in view of our legislation they are entitled to special consideration, but because they adhere more closely to the letter of the statute and tend to greater certainty in fixing the grade of the offense.

But while we hold that the failure of the jury to formally negative the fact that the crime in this case was of a higher degree than manslaughter is no ground for a reversal of the judgment, yet this rule can have no application where there are distinct offenses charged in different counts of the indictment. In such case the jury must either return a general verdict or respond specially to each charge in their finding. *Wilson v. The State*, 20 Ohio, 26.

The judgment of the district court is reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.