THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.*
CATALINO SÁNCHEZ MALDONADO, Defendant and Appellant.

No. 16047.   Argued March 1, 1956.—Decided April 3, 1956.

*Arcilio Alvarado* for appellant.   *José Trías Monge, Attorney General,* and *Rafael L. Ydrach Yordán* and *Ramón C. Ruiz Sánchez, Fiscal and Assistant Fiscal of the Supreme Court,* respectively, for appellee.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

Catalino Sánchez Maldonado, the appellant, was convicted by a jury of murder in the first degree and murder in the second degree, and subsequently sentenced to life imprisonment in the first count and ten to twelve years imprisonment in the penitentiary in the second count. He appealed from those judgments assigning two errors, to wit: (1) the verdicts were contrary to the evidence, and (2) the court erred in not granting a new trial.

■ In discussing the first error the appellant does not challenge the sufficiency of the evidence for the prosecution and agrees that the same establishes prima facie the two crimes of murder. His contention in essence is that the jury weighed erroneously the evidence concerning his mental incapacity.

Before considering this question it is convenient to make a summary of the evidence for the prosecution. It established that on the night of January 16, 1951, several head of cattle owned by defendant-appellant, Catalino Sánchez Maldonado, were caught damaging the property of the University of Puerto Rico. After capturing the cattle the watchman of the University, Aurelio Ramírez López, accompanied by Luis Alberto Cruz Santiago and Flor Ortiz Dones, went afoot to the municipal jail of Río Piedras herding the animals along. As they walked along Muñoz Marín Avenue, in the direction from Río Piedras to Caguas, a motor vehicle driven by the appellant approached them. He drove the car against Aurelio Ramos López, who was the one toward the center of the road, running over him and producing injuries which caused his death. The appellant then stopped the vehicle, descended from the car with a pipe in his hands and began hitting Luis Alberto Cruz who was trying to help Aurelio Ramos. Cruz also died as a result of the blows. The other fellow fled to avoid being assaulted. Shortly thereafter the

appellant was arrested by policeman Rafael Meliá León, who was driving along the road in his automobile and upon seeing a man with a pipe in his right hand trying to stop the vehicles that were passing by, stopped his car and asked him what was the matter with him, to which he answered "I have killed two persons and I want to give up." He then asked the policeman to take him to the Hato Rey Police Headquarters because in Río Piedras he might be killed. The policeman drove him in his car to the Hato Rey headquarters. On the way, the appellant told the policeman "I killed those two scoundrels, they'll not bully me again; the abuse of me is through." At police headquarters he declared in writing, under oath, that that night while in bed a boy came to tell him that his cattle were being taken to jail and that he then got up, got into his pick-up and went after the cows; that when he saw the cows in the road and three men herding them, he became nervous, speeded up, and drove the car against Leyo [Aurelio Ramos López]. Then he dismounted and hit Gilberto twice on the head and once on the arm when he came to help Leyo.

After the close of the evidence for the prosecution, the counsel for the defense announced that "defendant's evidence in this case is intended to establish the theory of criminal irresponsibility on the part of the defendant because he was not in control of his mental faculties." The evidence presented to this effect tended to establish that the defendant suffered from dementia praecox or schizophrenia of a hereditary origin. In his brief the appellant groups the evidence which he introduced under these four categories: (1) trait; (2) specific acts of the defendant revealing his mental incapacity; (3) technical evidence of the medical expert, and (4) the manner in which the events occurred. He contends that that evidence was not contradicted; that the jury had no conflicting evidence before it; that there was no basis for refusing to believe the evidence for the defense, and that the verdicts were clearly erroneous.

In our opinion he is not correct. The evidence concerning the defendant's hereditary trait established that three of his brothers had been committed to the Insane Asylum, two of them suffering from schizophrenia and another of oligophrenia; that three uncles on his father's side had committed suicide and that defendant's own father had also attempted suicide. It is true that this evidence was not contradicted. However, evidence of this kind is only admitted to corroborate other direct proof as to defendant's mental soundness but of itself does not establish his insanity. *Commonwealth* v. *Dale*, 107 Atl. 743; *People* v. *Gambacorta*, 90 N. E. 809; *Guiteau's Case*, 10 Fed. 161; *State* v. *Moore*, 76 P. 2d 19; *People* v. *Kohlmeyer*, 31 N. E. 2d 490; 1 Wharton's *Criminal Law*, 12th. Ed., § 83, p. 124; 2 Wigmore *On Evidence*, 3rd. Ed., § 232, p. 22; 28 *Am. Jur.*, § 133, p. 760.

■■ As to defendant's conduct before and after the commission of the crimes, his evidence tended to establish that on occasions he had performed specific peculiar acts, such as speaking to himself, crying without reason, unexpectedly abandoning his work, biting a cow's nose because it hit him with the tail; running out without apparent reason therefor, attacking his friends for any argument and having attempted suicide. Defendant's own wife testified, however, that he had lucid intervals for months at a time.

These facts do not prove that the defendant was insane at the time he committed the crimes. Defendant's insanity at the time of committing the criminal act is what exempts him from criminal responsibility. *People* v. *Alsina, ante* p. 44; 1 Wharton's *Criminal Evidence*, 11th Ed. § 318, p. 428; Werhofen, *Mental Disorder as a Criminal Defense*, pp. 52 and 323.

■■ The defense also introduced the testimony of a medical expert who testified that after a two-hour examination of the defendant while he was in jail, and after studying

his hereditary trait and knowing of his specific eccentricities as told by the witnesses for the defense, he had concluded that the defendant was a lunatic suffering from dementia praecox and that he could not distinguish between right and wrong at the time he committed the crimes charged. To challenge the testimony of this expert, the prosecuting attorney presented in rebuttal the testimony of another medical expert, Dr. Ramón Señeriz, a psychiatrist who testified that in order to determine scientifically whether a person is mentally unsound it is necessary that the psychiatrist examine the patient as follows: observation of the patient for a period of not less than thirty days except in those cases, where there have been symptoms of insanity from childhood, 3, 4, or 5 interviews then being enough; a study of the patient's and his ancestors' case history; a complete physical examination of the patient in order to determine whether there has been any organic injury; laboratory tests, such as an encephalorachidian test and an encephalography; observation of the patient in different and specific circumstances, and finally, periodic mental examinations. This expert further testified that a person's attempt to commit suicide is not sufficient to conclude that he is insane.

We have no doubt that the expert's testimony presented by the prosecuting attorney attacks the credibility of the expert presented by the defense. It was incumbent on the jury, therefore, to determine which testimony to believe. We have often stated that the opinion of an expert witness is not binding upon the triers and that in weighing expert evidence the court is not bound to accept the opinions of an expert. *People* v. *Dones*, 56 P.R.R. 201; *The People* v. *Bonelli*, 19 P.R.R. 65; *The People* v. *Sutton*, 17 P.R.R. 327.

██ Furthermore, the evidence for the prosecution revealed other circumstances which the jury could have considered in connection with the controversy as to the mental soundness of the defendant-appellant. His conduct imme-

diately prior and subsequent to the commission of the crimes furnished a reasonable basis for inferring his sanity.[1]  For example, the crimes he committed are not without motive. His statements to the policeman to the effect that he had killed those two scoundrels and that they would no longer bully him indicate his desire to take revenge on the persons who were taking his cows to jail.   His request to the policeman to take him to the Hato Rey headquarters because in Río Piedras he might be killed is the normal attitude of a person who fears reprisal for the acts which he has just committed and seeks protection for his life and person.   Still more, the prosecuting attorney, Dueño, testified that the defendant was calm and peaceful at the Hato Rey headquarters; that he answered correctly all the questions asked and that his testimony was not incoherent, to the extent that the prosecuting attorney never had any doubts as to defendant's mental soundness.

The defense of insanity in a criminal prosecution is a question of fact to be determined by the jury upon evidence introduced bearing upon such issue and under adequate instructions by the court.  *Fisher* v. *Fraser*, 233 P. 2d 1066; *State* v. *Moore, supra; Stevens* v. *State*, 99 Am. Dec. 634; *Ryan* v. *People*, 153 Pac. 756; *State* v. *Brown*, 102 Pac. 641; *People* v. *Scott*, 88 N. E. 35; *State* v. *Keerl* 75 Pac. 362; 2 Wharton's *Criminal Evidence*, 11th Ed. § 894, p. 1542. After having weighed the entire evidence introduced in this case, the jury could determine, as it did, that the defendant-appellant was not insane at the time he committed the crimes charged by the prosecuting attorney.   Consequently, the verdicts of conviction are not incorrect   The first error assigned was not committed.

---

[1] As to the relevancy of the evidence concerning the acts, condition and conduct of the accused, prior and subsequent to the commission of the offense, see, among other authorities 1 Wharton's *Criminal Evidence, supra,* Werhofen, *op. cit.,* p. 312.

The second assignment attacks the order denying a new trial. Since the defendant did not appeal from said order, this Court cannot consider the error assigned. *People v. Millán*, 66 P.R.R. 233; *Rodríguez v. People*, 75 P.R.R. 377; *People v. Busigó*, 78 P.R.R. 153.

The judgments appealed from will be affirmed.

Mr. Justice Belaval concurs in the results.